Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Sean Gorton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co., GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY COMPANY,

Plaintiffs,

        -against-

YAKOV ZILBERMAN, D.C.,
YAN Z CHIROPRACTIC, P.C.,
MAZ CHIROPRACTIC, P.C.,
SANFORD CHIROPRACTIC, P.C.,
DOS MANOS CHIROPRACTIC, P.C., and
YAKOV KRUGLYAK,

        Defendants.
-----------------------------------------------------------------------X

Docket No.: 1:20-cv-00209
(FB)(RML)

**Plaintiff Demands a Trial by Jury**

## AMENDED COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants, Yakov Zilberman, D.C., Yan Z

Chiropractic, P.C., Maz Chiropractic, P.C., Sanford Chiropractic, P.C., Dos Manos Chiropractic,

P.C., and Yakov Kruglyak (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1,200,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including purported patient examinations, nerve conduction velocity ("NCV") testing, electromyography ("EMG") studies, pain fiber nerve conduction studies ("PfNCS"), ultrasound tests, and chiropractic manipulations (collectively the "Fraudulent Services"), which allegedly were provided to New York automobile accident victims insured by GEICO ("Insureds") and other insurers.

2.      Defendant, Yakov Zilberman, D.C. ("Zilberman"), is a chiropractor licensed to practice in New York who purports to own a series of chiropractic professional corporations, including Defendants Yan Z Chiropractic, P.C., Maz Chiropractic, P.C., Sanford Chiropractic, P.C., and Dos Manos Chiropractic, P.C. (collectively, the "PC Defendants"), that have billed GEICO and other New York automobile insurers for the excessive and medically useless Fraudulent Services.  The PC Defendants purport to be legitimate professional corporations, but they operate on a transient basis, maintaining no stand-alone practices, having no patients of their own, and providing no legitimate or medically necessary services.

3.      Zilberman, with the aid of Defendant Yakov Kruglyak ("Kruglyak"), perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit the PC Defendants to access a steady stream of patients, fraudulently bill GEICO, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

4.      Specifically, Kruglyak assisted with the operation of Zilberman's transient chiropractic operations and provided Zilberman and the PC Defendants with access to the patient

base at various "medical mill" healthcare clinics at which Zilberman and the PC Defendants operated in exchange for the payment of hundreds of thousands of dollars in kickbacks for the referral of automobile accident victims. Many of these payments were illegally cashed at check cashing facilities using forged Internal Revenue Service documents and false corporate resolutions.

5.     These illegal arrangements enabled Zilberman and the PC Defendants to submit charges for the Fraudulent Services for a huge volume of patients, and allowed Zilberman, the PC Defendants, and Kruglyak to profit from the Fraudulent Services.

6.     GEICO seeks to recover the monies stolen from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $3,400,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the PC Defendants because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)   the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback arrangements; and

(iv)    in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants, and therefore were unreimbursable.

7.     The Defendants fall into the following categories:

(i)     Defendants Yan Z Chiropractic, P.C. ("Yan Z"), Maz Chiropractic, P.C. ("Maz"), Sanford Chiropractic, P.C. ("Sanford"), and Dos Manos Chiropractic, P.C. ("Dos Manos")(collectively, the "PC Defendants") are a series of New York chiropractic professional corporations through which

the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including GEICO.

(ii)    Defendant Yakov Zilberman, D.C. ("Zilberman") is a chiropractor licensed to practice chiropractic in New York, who purports to own the PC Defendants, and who purported to perform some of the Fraudulent Services.

(iii)   Defendant Yakov Kruglyak ("Kruglyak") is an individual who furthered the fraudulent scheme perpetrated against GEICO by assisting with the operation of Zilberman's transient chiropractic operations and providing Zilberman and the PC Defendants with access to the patient base at various "medical mill" healthcare clinics at which Zilberman and the PC Defendants operated in exchange for the payment of hundreds of thousands of dollars in illegal kickbacks.

8.      As discussed herein, the Defendants at all relevant times have known that (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iii) the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback arrangements; and (iv) in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of Zilberman or the PC Defendants.

9.      As such, Zilberman and the PC Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the PC Defendants.

10.     The charts annexed hereto as Exhibits "1" – "4" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO under the names of the PC Defendants.

11.     The Defendants' fraudulent scheme continues uninterrupted through the present day, as the PC Defendants continue to seek collection on pending charges for the Fraudulent Services.

12.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,200,000.00.

## THE PARTIES

### I.     Plaintiffs

13.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal place of business in Chevy Chase, Maryland.   GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

14.     Defendant Zilberman resides in and is a citizen of New York.  Zilberman was licensed to practice chiropractic in New York on July 30, 2003 and serves as the nominal or "paper" owner of the PC Defendants.

15.     Defendant Yan Z is a New York professional corporation incorporated on or about April 16, 2010, with its principal place of business in New York, and purports to be owned and controlled by Zilberman.  Yan Z has been used by Zilberman, Kruglyak, and others as a vehicle to submit fraudulent billing to GEICO and other insurers.

16.     Defendant Maz is a New York professional corporation incorporated on or about August 29, 2014 with its principal place of business in New York, and purports to be owned and controlled by Zilberman.  Maz has been used by Zilberman, Kruglyak, and others as a vehicle to submit fraudulent billing to GEICO and other insurers.

17.     Defendant Sanford is a New York professional corporation incorporated on or about November 10, 2016 with its principal place of business in New York, and purports to be owned and controlled by Zilberman.  Sanford has been used by Zilberman, Kruglyak, and others as a vehicle to submit fraudulent billing to GEICO and other insurers.

18.     Defendant Dos Manos is a New York professional corporation incorporated on or about September 26, 2017 with its principal place of business in New York, and purports to be owned and controlled by Zilberman.  Dos Manos has been used by Zilberman, Kruglyak, and others as a vehicle to submit fraudulent billing to GEICO and other insurers.

19.     Defendant Kruglyak resides in and is a citizen of New York.  Kruglyak is an unlicensed layperson who assisted with the operation of Zilberman's transient chiropractic operations and provided Zilberman and the PC Defendants with access to the patient base at various "medical mill" healthcare clinics at which Zilberman and the PC Defendants operated in exchange for the payment of hundreds of thousands of dollars in illegal kickbacks.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

21.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

23.     GEICO underwrites automobile insurance in New York.

**I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement**

24.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

25.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including chiropractic services.

26.     In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

27.     In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, in New York, a healthcare services provider

may submit claims using the Health Care Financing Administration claim form (known as the "HCFA-1500 form").

28.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

29.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

30.     In New York, only a licensed chiropractor may practice chiropractic, may own and control a professional corporation authorized to practice chiropractic and, absent statutory exceptions not applicable in this case, may derive economic benefit from chiropractic services. Unlicensed individuals in New York may not practice chiropractic, may not own or control a professional corporation authorized to practice chiropractic, may not employ or supervise chiropractors or physicians, and, absent statutory exceptions not applicable in this case, may not derive economic benefit from chiropractic services.

31.     New York law prohibits licensed healthcare services providers, including chiropractors, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

32.     New York law prohibits unlicensed persons not authorized to practice a profession, like chiropractic, from practicing the profession and from sharing in the fees for professional services.  See e.g., New York Education Law §6512, §6530 (11), and (19).

33.     Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments rendered, or allows unlicensed laypersons to share in the fees for the professional services.

34.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

35.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits.  There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider.  The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

36.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the actual provider of the services.  Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from

an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

37.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

38.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

39.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

### A.     Overview of the Scheme

40.     Zilberman, the PC Defendants, and Kruglyak (collectively, the "Defendants"), masterminded and implemented a complex fraudulent scheme in which the PC Defendants were used to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, illusory, and otherwise unreimbursable services.

41.     The Fraudulent Services billed under the names of the PC Defendants were not medically necessary and were provided – to the extent that they were provided at all – pursuant to

pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render healthcare services.

42.     Zilberman did not operate the PC Defendants at any single, fixed location.

43.     Zilberman did not market the existence of any of the PC Defendants to the general public.

44.     Zilberman did not advertise for patients, never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of any of the PC Defendants.

45.     Zilberman did not have his own patients, and did nothing to create a patient base.

46.     Zilberman did virtually nothing that would be expected of the owner of legitimate chiropractic professional corporations to develop their reputation and attract patients.

47.     Zilberman, instead, operated the PC Defendants with Kruglyak's assistance on an itinerant basis from various "No-Fault" medical clinics, primarily located in Brooklyn, Queens, and Bronx, where the PC Defendants received steady volumes of patients through no efforts of their own, including at the following clinics (collectively, the "Clinics"):

- 1220 East New York, Brooklyn;
- 615 Seneca Avenue, Ridgewood;
- 3910 Church Avenue, Brooklyn;
- 1568 Ralph Avenue, Brooklyn;
- 9801 Foster Avenue, Brooklyn;
- 152-80 Rockaway Boulevard, Jamaica;
- 2625 Atlantic Avenue, Brooklyn;
- 5008 Avenue N, Brooklyn;
- 87-10 Northern Boulevard, Jackson Heights;
- 2488 Grand Concourse, Bronx;
- 550 Remsen Avenue, Brooklyn;
- 665 Pelham Parkway, Bronx;
- 717 Southern Boulevard, Bronx;
- 764 Elmont Road, Elmont; and
- 108 Kenilworth Place, Brooklyn

### B.     The Illegal Kickback and Referral Relationships

48.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

49.     The Clinics provided facilities for the PC Defendants, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

50.     In fact, GEICO received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

51.     For example, GEICO has received billing for purported healthcare services rendered at the clinic located at 764 Elmont Road, Elmont, from a "revolving door" of approximately 60 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than thirteen different chiropractic "names", including Seasoned Chiropractic PC, Albis Chiropractic Care, PC, State Chiropractic, PC, Real Chiropractic Care PC, Professional Chiropractic PC, Dr. Bruce Jacobson DC, PC, Queens Chiropractic Care PC, Genesis Chiropractic Care, PC, Whiplash Chiropractic, PC, JB Chiropractic Services PC, Actual Chiropractic, PC, Active Chiropractic, PC, and billing from Zilberman's chiropractic professional corporation, Sanford.

52.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 550 Remsen Avenue, Brooklyn, from a "revolving door" of more than 100 purportedly different healthcare providers.   The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than fifteen different chiropractic "names", including Supreme Health Chiropractic, PC, Shashek Chiropractic, PC, Pro-Align Chiropractic, PC, Pro Edge Chiropractic, PC, Remedy Chiropractic, PC, Sun Chiropractic Services, PC, Morris Park Chiropractic PLLC, Attentive Chiropractic Wellness, PC, Direct Chiropractic Care, PC, JB Chiropractic Services, PC, Pro Adjust Chiropractic, PC, Brook Chiropractic of NY, PC, Crosstown Chiropractic, PC, and billing from Zilberman's chiropractic professional corporations, Dos Manos, Yan Z, and Sanford.

53.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 665 Pelham Parkway, Bronx, from a "revolving door" of more than 75 purportedly different healthcare providers.   The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than fifteen different chiropractic "names", including Supreme Health Chiropractic, PC, Shashek Chiropractic, PC, Seasoned Chiropractic, PC, Advanced Chiropractic Care, PC, Axis Chiropractic Care, PC, Albis Chiropractic Care, PC, BMJ Chiropractic, PC, Remedy Chiropractic, PC, JTK Chiropractic Care, PC, Narra Chiropractic, PC, Direct Chiropractic Care, PC, JB Chiropractic Services, PC, Crosstown Chiropractic, PC, Patriot Chiropractic, PC, and billing from Zilberman's chiropractic professional corporations, Sanford and Dos Manos.

54.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 1220 East New York Avenue, Brooklyn, from a "revolving door" of more than 60 purportedly different healthcare providers.   The billing submitted to GEICO from this Clinic

included billing for purported chiropractic services under more than ten different chiropractic "names", including Stone Chiropractic, PC, New Beginning Chiropractic, PC, Supreme Health Chiropractic, PC, Total Chiropractic, PC, Pro-Align Chiropractic, PC, Alen Oven Chiropractic Care, PC, Bodyworks Chiropractic, PC, Professional Chiropractic Care, PC, Direct Chiropractic Care, PC, New York Core Chiropractic, PC, and billing from Zilberman's chiropractic professional corporation, Dos Manos.

55.      Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 615 Seneca Avenue, Ridgewood, from a "revolving door" of more than 100 purportedly different healthcare providers.  The billing submitted to GEICO from this Clinic included billing for purported chiropractic services under more than fifteen different chiropractic "names", including Aries Chiropractic, PC, Atlantic Chiropractic, PC, Pro-Align Chiropractic, PC, Park Avenue Chiropractic Healthcare, PC, Queens Chiropractic Care, PC, Pro Edge Chiropractic, PC, State Chiropractic, PC, Real Chiropractic Care, PC, Genesis Chiropractic Care, PC, New York Core Chiropractic, PC, Direct Chiropractic Care, PC, Urgent Chiropractic Care, PC, Whiplash Chiropractic, PC, Welcome Chiropractic, PC, and billing from Zilberman's chiropractic professional corporations, Dos Manos and Sanford.

56.      Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics.

57.      Zilberman, in order to obtain access to the Clinics' patient base (i.e., Insureds), entered into illegal financial arrangements with unlicensed persons, including Kruglyak, who assisted with the operation of the PC Defendants and provided access to the patients that were treated, or who purported to be treated, at the Clinics.

58.     In keeping with the fact that Kruglyak provided access to patients that were treated, or who purported to be treated, at the Clinics, Kruglyak previously opened a billing company – Alan Enterprises, LLC – which he then "sold" to his daughter for $1.00.

59.     Alan Enterprises, LLC was responsible for scheduling certain of the PC Defendants to provide treatment at the various Clinics.

60.     The financial arrangements that Zilberman and the PC Defendants entered into with unlicensed laypersons, including Kruglyak, included the payment of fees ostensibly to "rent" space or personnel from the Clinics or fees for ostensibly legitimate services such as marketing, advertising, consulting, billing, and collection services.  In fact, however, these were "pay-to-play" arrangements that caused unlicensed laypersons, including Kruglyak, to steer Insureds to the PC Defendants for medically unnecessary services at the Clinics.

61.     For example, Kruglyak directed Zilberman to issue over $65,000.00 worth of checks to the Narain Law Firm, P.C. from Dos Manos' corporate bank account.  While these payments were purportedly for "legal fees", the Narain Law Firm, P.C. has never represented or even heard of any of the Defendants.  Instead, these checks were illegally exchanged for cash at a check-cashing facility using a forged letter from the Internal Revenue Service and a false corporate resolution in furtherance of the Defendants' illegal patient brokering scheme.

62.     Similarly, Kruglyak directed Zilberman to issue over $30,000.00 worth of checks to Gabriel & Shapiro, P.C. and the Law Offices of Gabriel & Shapiro, LLC from Dos Manos' corporate bank account.  While these payments were purportedly for "legal fees", these checks were actually illegally exchanged for cash at a check-cashing facility using a forged letter from the Internal Revenue Service and a false corporate resolution in furtherance of the Defendants' illegal patient brokering scheme.

63.     Similarly, Kruglyak directed Zilberman to issue over $110,000.00 worth of checks to W.I.P. Holding, Inc. – a company owned by Kruglyak – from Dos Manos' and Yan Z's corporate bank accounts.  Kruglyak intentionally had many of these payments exchanged for cash at a check-cashing facility using a false corporate resolution and forged letter from the Internal Revenue Service in furtherance of the Defendants' illegal patient brokering scheme.

64.      Similarly, Kruglyak directed Zilberman to issue over $2,500.00 worth of checks to Crosstown Medical, P.C. from Dos Manos' corporate bank account.  While these payments were purportedly for "rent", these checks were actually illegally exchanged for cash at a check-cashing facility using a forged letter from the Internal Revenue Service and a false corporate resolution in furtherance of the Defendants' illegal patient brokering scheme.

65.     Similarly, Kruglyak directed Zilberman to issue over $2,000.00 worth of checks to Metro Pain Specialists, P.C. from Dos Manos' corporate bank account.  While these payments were purportedly for "rent", these checks were actually illegally exchanged for cash at a check-cashing facility using a forged letter from the Internal Revenue Service and a false corporate resolution in furtherance of the Defendants' illegal patient brokering scheme.

66.     Similarly, Kruglyak directed Zilberman to issue over $1,500.00 worth of checks to Singh PT, P.C. from Dos Manos' corporate bank account.  While these payments were purportedly for "rent", these checks were actually illegally exchanged for cash at a check-cashing facility using a false corporate resolution in furtherance of the Defendants' illegal patient brokering scheme.

67.     The above-referenced checks were illegally exchanged for cash by non-party Alla Kuratova ("Kuratova").

68.     In 2013, Kuratova was indicted for her involvement in a prescription drug trafficking ring, which included the recruitment of individuals to act as phony patients in visits with corrupt

medical practitioners where they received prescriptions for medically unnecessary prescription pain medication.

69.    Moreover, Zilberman also caused Maz to issue checks from Maz's corporate bank account to the bank accounts of shell companies controlled by Igor Dovman ("I. Dovman") and Tamilla Dovman ("T. Dovman") ("I. Dovman" and "T. Dovman" are collectively the "Dovmans"). The shell companies paid by Maz were disguised as putative marketing, consulting, billing, and supply companies (the "Dovman Shell Entities"), but had no actual business operations besides maintaining bank accounts.

70.    The monies paid by Maz to the Dovman Shell Entities were, in actuality, part of the "pay-to-play" kickbacks that furthered the referral of Insureds to the PC Defendants at the various Clinics.

71.    In order to conceal the kickback scheme and their involvement with the Dovman Shell Entities, the Dovmans filed Certificates of Incorporation with New York State listing the names of individuals as "incorporators" of each entity, but who in fact either: (i) did not exist; or (ii) had no apparent connection to the underlying entity.

72.    During a three-month period in 2017, Maz paid more than $20,000.00 in kickbacks to the Dovman Shell Entities.  The following chart outlines the specific Dovman Shell Entities identified to date that were funneled kickbacks by the Defendants, along with the phony "incorporator" listed by the Dovmans on the respective Certificates of Incorporation:

| Dovman Shell Entity | Nominal Incorporator | True Owners/Operators |
|---|---|---|
| JER. Advertising & Consulting, Inc. | Jerom McKay | Igor Dovman and Tamilla Dovman |
| SGB Supply Inc. | Sara Giu | Igor Dovman and Tamilla Dovman |
| AC Billing & Collections Inc. | Anna Chaudrey | Igor Dovman and Tamilla Dovman |

73.    In keeping with the fact that the Dovman Shell Entities were shams involved in a patient brokering and referral scheme, during a March 9, 2018 non-party deposition in Government

Employees Ins. Company, et al. v. Mayzenberg, et al., Docket No. 1:17-cv-02802-ILG-LB (E.D.N.Y. 2017) ("GEICO v. Mayzenberg"), I. Dovman invoked his Fifth Amendment protection against self-incrimination when asked whether he had incorporated a series of companies as a means of concealing a fraudulent kickback scheme.

74.    Zilberman also caused Maz to issue $20,000.00 worth of checks to Daniel Corley, Esq. ("Corley") through Maz's corporate bank account.   While each of these checks were purportedly for legal fees, the funds were deposited into a Santander Bank Account in Corley's name that was actually controlled by the Dovmans and used to facilitate an illegal patient brokering scheme.

75.    In keeping with the fact that the Dovmans controlled the Corley Santander Account and the Corley Santander Account was used to facilitate an illegal patient brokering scheme, during an April 16, 2020 non-party deposition in this matter, Corley invoked his Fifth Amendment privilege against self-incrimination when asked whether the Dovmans controlled the Corley Santander Account and whether Zilberman issued payments to Corley in furtherance of an illegal patient brokering scheme.

76.    Zilberman and the PC Defendants made the various kickback payments in exchange for having Insureds referred to one or more of the PC Defendants for the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

77.    The amount of kickbacks paid by Zilberman and the PC Defendants generally was based on the volume of Insureds that were steered to the PC Defendants for the purported medically unnecessary services as determined by Kruglyak and others.

78.     Zilberman had no genuine chiropractor-patient relationship with the Insureds that visited the Clinics, as the patients had no scheduled appointments with the PC Defendants.  Instead, the Insureds were simply directed by the Clinics, and the unlicensed persons associated therewith, to subject themselves to treatment by whatever chiropractor was working for the PC Defendants that day, because of the kickbacks paid by Zilberman and the PC Defendants to Kruglyak and others.

79.     The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme.  The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

80.     Zilberman and Kruglyak at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

81.     In fact, Zilberman incorporated a series of chiropractic professional corporations, splitting the Defendants' billing for the Fraudulent Services across the various chiropractic professional corporations in order to limit the amount of billing and type of services being submitted by each PC Defendant.

82.     The Defendants conducted their scheme through multiple chiropractic professional corporations using different tax identification numbers, in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

83.     Moreover, Kruglyak intentionally had many of the kickback payments illegally exchanged for cash using a forged letter from the Internal Revenue Service and false corporate resolutions.

C.    **Defendants' Fraudulent Treatment and Billing Protocol**

84.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants implemented a scheme whereby Zilberman and the PC Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

85.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

86.    No legitimate chiropractor or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

87.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

1.    **The Fraudulent Charges for Initial Chiropractic Examinations**

88.    Upon receiving a referral pursuant to the kickbacks that Zilberman and the PC Defendants paid to Kruglyak and other owners, operators, and/or medical professionals that operated from the Clinics, the Defendants purported to provide most of the Insureds in the claims identified in Exhibits "1" – "4" with an initial chiropractic examination.

89.    In keeping with the fact that the initial chiropractic examinations were performed pursuant to the kickbacks that Zilberman and the PC Defendants paid at the Clinics, the PC

Defendants virtually always purported to perform the initial chiropractic examinations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

90.     The initial chiropractic examinations were performed as a "gateway" in order to provide Insureds with an excessive number of phony, pre-determined "diagnoses" to allow Zilberman and the PC Defendants to then purport to provide medically unnecessary, illusory, or otherwise unreimbursable, PfNCS tests, EMG and NCV tests, ultrasound tests, and in-office chiropractic treatment.

91.     Typically, either Zilberman or someone associated with the PC Defendants purported to perform the initial chiropractic examinations, which were billed to GEICO through one of the PC Defendants.

92.     The Defendants virtually always billed the initial chiropractic examinations to GEICO under current procedural terminology ("CPT") codes 99201, 99202, or 99203.

93.     The charges for the initial chiropractic examinations were fraudulent in that the initial chiropractic examinations were medically unnecessary and were performed pursuant to the kickbacks that the Defendants paid at the Clinics in coordination with Kruglyak and others, not to treat or otherwise benefit the Insureds.

94.     In keeping with the fact that the charges for the initial chiropractic examinations were fraudulent, Zilberman caused Dos Manos to submit charges to GEICO for purported initial chiropractic examinations under CPT code 99201 at the same rate as charges Zilberman and the PC Defendants submitted to GEICO for purported initial chiropractic examinations under CPT code 99203.

95.     Specifically, Dos Manos virtually always billed GEICO $54.74 for purported initial chiropractic examinations under CPT code 99201, and Zilberman and the PC Defendants virtually always billed GEICO $54.74 for purported initial chiropractic examinations under CPT code 99203.

96.     Zilberman and Dos Manos submitted charges of $54.74 under CPT code 99201 because they knew that continuing to submit charges of $54.74 under CPT code 99203 was more likely to arouse suspicion and draw attention to the Defendants' fraudulent scheme.

97.     Furthermore, the charges for the initial chiropractic examinations under CPT codes 99202 and 99203 were fraudulent in that they misrepresented the extent of the initial chiropractic examinations.

98.     For example, in every claim identified in Exhibits "1", "2", "3", and "4" for initial chiropractic examinations under CPT codes 99202 and 99203, Zilberman and the PC Defendants misrepresented and exaggerated the amount of face-to-face time that the examining chiropractor spent with the Insureds or the Insureds' families.

99.     The use of CPT code 99202 typically requires that a chiropractor spend 20 minutes of face-to-face time with the Insured or the Insured's family.

100.    The use of CPT code 99203 typically requires a chiropractor to spend 30 minutes of face-to-face time with the Insured or the Insured's family.

101.    Though Zilberman and the PC Defendants billed for many of their chiropractic examinations under CPT codes 99202 and 99203, no chiropractor or other healthcare professional associated with the PC Defendants spent 20 minutes, let alone 30 minutes, on an initial chiropractic examination.

102.    Rather the initial chiropractic examinations in the claims identified in Exhibits "1", "2", "3", and "4" rarely lasted more than 10-15 minutes.

103.    In keeping with the fact that the initial chiropractic examinations rarely lasted more than 10-15 minutes, Zilberman and the PC Defendants used checklist forms in purporting to conduct the initial chiropractic examinations.

104.    The checklist forms that Zilberman and the PC Defendants used in conducting the initial chiropractic examinations set forth a limited range of potential patient complaints examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

105.    All that was required to complete the checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds.

106.    These interviews and examinations did not require Zilberman and the PC Defendants to spend more than 10-15 minutes of face-to-face time with the Insureds during the putative initial chiropractic examinations.

107.    In addition, pursuant to the Fee Schedule, when Zilberman and the PC Defendants submitted charges for initial chiropractic examinations under CPT code 99203, or caused them to be submitted, they falsely represented that a chiropractor associated with one of the PC Defendants: (i) took a "detailed" patient history; and (ii) conducted a "detailed" physical examination.

### a.    Misrepresentations Regarding "Detailed" Patient Histories

108.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), a "detailed" patient history requires – among other things – that the examining physician or chiropractor take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

109.    However, in the claims for initial chiropractic examinations identified in Exhibits "1", "2", "3", and "4", Zilberman and the PC Defendants, never took a "detailed" patient history from Insureds during the initial chiropractic examinations, inasmuch as they did not take a history

of systems related to the patient's presenting problems and did not conduct any review of a limited number of additional systems.

110.    Rather, after purporting to provide the initial chiropractic examinations, Zilberman and the PC Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

111.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii) Fraudulent Services that Zilberman and the PC Defendants purported to provide and then billed to GEICO and other insurers.

**b.    Misrepresentations Regarding "Detailed" Physical Examinations**

112.    Moreover, pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

113.    To the extent that the Insureds in the claims identified in Exhibits "1", "2", "3", and "4" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

114.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to the following:

> (i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)    brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)    coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

115.    In the claims for initial chiropractic examinations in Exhibits "1", "2", "3", and "4" in which the Defendants billed for the initial chiropractic examinations under CPT code 99203, Zilberman and the PC Defendants falsely represented that they conducted a "detailed" patient examination of the Insureds they purported to treat during the initial chiropractic examinations.

116.    In fact, Zilberman and the PC Defendants never conducted a "detailed" patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

## 2.    The Fraudulent Charges for Follow-Up Examinations

117.    In addition to the fraudulent initial chiropractic examinations, Zilberman and the PC Defendants purported to subject the Insureds to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

118.    Zilberman and the PC Defendants typically billed the follow-up examinations to GEICO under CPT code 99212.

119.    Like the Defendants' charges for the initial chiropractic examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the kickbacks that Zilberman and the PC Defendants paid at the Clinics not to treat or otherwise benefit the Insureds.

### 3.    The Fraudulent Charges for Electrodiagnostic Testing

120.     As set forth in Exhibits "1", "2", "3", and "4" the Defendants also purported to subject many Insureds to a series of medically unnecessary and useless NCV, EMG, and PfNCS tests (collectively "EDX tests").

121.    The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed pursuant to the kickbacks that Zilberman and the PC Defendants paid at the Clinics in coordination with Kruglyak and others, not to treat or otherwise benefit the Insureds.

### a.    The Human Nervous System and Electrodiagnostic Testing

122.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including, the arms and legs and into the hands and feet.  Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

123.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves.  They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

124.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs, including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

125.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Zilberman and the PC Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

126.    PfNCS tests are purportedly a form of electrodiagnostic testing, and purportedly were provided by Zilberman and the PC Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

127.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

128.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical

organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.  A copy of the Recommended Policy is annexed hereto as Exhibit "5".

129.    The Recommended Policy does not identify PfNCS tests as having any documented utility in diagnosing radiculopathies.  See Exhibit "5".  In fact, PfNCS tests are not recognized as having any value in the diagnosis of any medical condition.

### b.    The Fraudulent NCVs

130.    NCV tests are non-invasive tests in which peripheral nerves, including those in the arms and legs, are stimulated with an electrical impulse to cause the nerve to depolarize.  The depolarization, or "firing", of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

131.    An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

132.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform".  The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

133.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests.  Moreover, most of these peripheral nerves have both sensory and motor nerve fibers either or both of which can be tested with NCV tests.

134.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests.  F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again.  The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

135.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.  See Exhibit 5.

136.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Zilberman and the PC Defendants routinely purported to test far more nerves than recommended by the Recommended Policy, and then submitted billing to GEICO through Sanford.

137.    Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, Zilberman and the PC Defendants routinely purported to perform: (i) NCV tests of eight motor nerves; (ii) NCV tests of between ten and fourteen sensory nerves; and (iii) two H-reflex studies.

138.    Therefore, where the Fee Schedule and Recommended Policy would limit billing by Zilberman and the PC Defendants for NCV testing of one Insured to approximately $950.00, representing NCVs of three motor nerves, NCVs of two sensory nerves, and two H-reflex studies, Zilberman and the PC Defendants routinely submitted NCV billing to GEICO for more than $2,000.00 per Insured.

139.    For instance:

(i)     On or about March 26, 2018, the Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of fourteen sensory nerves;

and (iii) two H-reflex studies on an Insured named LJ.  The Defendants then submitted two bills to GEICO through Sanford for a total of $2,094.73 worth of billing for NCV tests.

(ii)     On or about March 26, 2018, the Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of fourteen sensory nerves; and (iii) two H-reflex studies on an Insured named CS. The Defendants then submitted two bills to GEICO through Sanford for a total of $2,094.73 worth of billing for NCV tests.

(iii)    On or about March 26, 2018, the Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of fourteen sensory nerves; and (iii) two H-reflex studies on an Insured named MJ.  The Defendants then submitted two bills to GEICO through Sanford for a total of $2,094.73 worth of billing for NCV tests.

(iv)     On or about March 26, 2018, the Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of fourteen sensory nerves; and (iii) two H-reflex studies on an Insured named NB.  The Defendants then submitted two bills to GEICO through Sanford for a total of $2,094.73 worth of billing for NCV tests.

(v)      On or about August 21, 2018, the Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named OB.  The Defendants then submitted two bills to GEICO through Sanford for a total of $2,094.73 worth of billing for NCV tests.

(vi)     On or about June 6, 2018, the Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named JD.  The Defendants then submitted two bills to GEICO through Sanford for a total of $2,094.73 worth of billing for NCV tests.

(vii)    On or about June 21, 2018, the Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named GD.  The Defendants then submitted two bills to GEICO through Sanford for a total of $2,094.73 worth of billing for NCV tests.

(viii)   On or about May 24, 2018, the Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named FG.  The Defendants then submitted one bill to GEICO through Sanford for a total of $2,094.73 worth of billing for NCV tests.

(ix)     On or about June 7, 2018, the Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named JC.  The Defendants then submitted one bill to GEICO through Sanford for a total of $2,094.73 worth of billing for NCV tests.

(x)      On or about June 7, 2018, the Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named MC.  The Defendants then submitted one bill to GEICO through Sanford for a total of $2,094.73 worth of billing for NCV tests.

140.     Zilberman and the PC Defendants concealed the fact that they routinely purported to test far more nerves than recommended by the Recommended Policy, by using improper CPT codes to describe the testing they purportedly performed and sometimes splitting their NCV billing into two separate bills.

141.     Specifically, Zilberman and the PC Defendants often submitted: (a) multiple charges using CPT code 95903 for NCV tests with F-wave studies of eight motor nerves; (b) multiple charges using CPT code 95904 for NCV tests of ten sensory nerves; (c) multiple charges using CPT code 95900-59 for NCV tests of two motor nerves without F-wave studies; and (d) one charge using CPT code 95934 for H-reflex studies of two nerves.

142.     In instances where Zilberman and the PC Defendants purportedly performed NCV tests of fourteen sensory nerves, as outlined above, instead of submitting bills to GEICO that indicated that Zilberman and the PC Defendants purportedly performed NCV tests of the fourteen sensory nerves indicated on the pertinent treatment reports, Zilberman and the PC Defendants' billing submissions indicate that they purportedly performed NCV tests of ten sensory nerves.

143.     Instead of billing the remaining NCV tests of four sensory nerves as such, Zilberman and the PC Defendants billed and charged GEICO for these four additional sensory

nerves by submitting two separate charges under CPT code 95900-59, which represents NCV tests of one motor nerve without F-wave studies.

144.    In instances where Zilberman and the PC Defendants purportedly performed NCV tests of fourteen sensory nerves, Zilberman and the PC Defendants misrepresented the nature of the NCV tests they purportedly provided because they knew that submitting billing to GEICO for fourteen sensory nerves per Insured would arouse suspicion and draw attention to their fraudulent scheme.

145.    In addition, in instances where Zilberman and the PC Defendants purportedly performed NCV tests of ten sensory nerves, as outlined above, Zilberman and the PC Defendants still submitted two separate charges under CPT code 95900-59, which represents NCV tests of one motor nerve without F-wave studies.

146.    In doing so Zilberman and the PC Defendants represented that they performed NCV tests on more nerves than they actually did and billed GEICO for services that were not actually provided.

c.    **The Fraudulent EMG Tests**

147.    As part of the pre-determined fraudulent treatment and billing protocol, Zilberman and the PC Defendants also purported to provide medically unnecessary EMGs to virtually all Insureds who received NCV tests.  Zilberman and the PC Defendants submitted billing for the fraudulent EMGs through Sanford.

148.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle.  The sound and appearance of the electrical activity in each such muscle are compared

with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

149.    According to the Recommended Policy, the maximum number of EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is EMGs of two limbs.  See Exhibit "5".

150.    Zilberman and the PC Defendants purported to provide and/or perform EMGs to Insureds to determine whether the Insureds suffered from radiculopathies.  In actuality, the EMGs were provided – to the extent they were provided at all – as part of the Defendants' pre-determined fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

151.    There are many different muscles in the arms and legs that can be tested using EMGs.  The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances.  In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle.

152.    As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

153.    Zilberman and the PC Defendants did not tailor the EMGs they purported to perform to the unique circumstances of each patient.  Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patients' presentation.

154.    Furthermore, even if there were any need for any of the EMGs, the nature and number of the EMGs that Zilberman and the PC Defendants purported to provide and/or perform

frequently grossly exceeded the maximum number of limbs tested – i.e., EMGs of two limbs – that are necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

155.    Nevertheless, Zilberman and the PC Defendants routinely purported to provide and/or perform EMGs on all four limbs on virtually every Insured, in excess and contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO and other insurers, and solely to maximize the profits that Defendants could reap from each Insured.

156.    In keeping with the fact that the purported EMG tests were medically useless, the putative "results" of the EMG tests were not incorporated into any Insured's treatment plan and they played no genuine role in the treatment or care of the Insureds.

157.    In keeping with the fact that Zilberman and the PC Defendants performed the Fraudulent Services pursuant to a fraudulent, predetermined treatment and billing protocol designed solely to maximize profit, Zilberman and the PC Defendants always performed (or purported to perform) the EMG and NCV tests immediately following the initial examination.  A proper neurological history and examination followed by a thoroughly conducted four-limb EMG and NCV test would require Zilberman and the PC Defendants to spend at least two hours with each patient.  The fact that each of the patients purportedly subjected to the fraudulent EMG and NCV tests set aside two hours to receive a neurological examination and EMG and NCV tests indicates that either: (i) the patients knew in advance that they were to receive the EMG and NCV tests because the EMG and NCV tests are rendered pursuant to a *pre-determined* treatment protocol, or (ii) the Fraudulent Services were not actually performed as billed.

### d.    The Fraudulent PfNCS Tests

158.    As part of the fraudulent treatment protocol and kickback scheme, Zilberman and the PC Defendants purported to subject Insureds to medically unnecessary PfNCS tests.

159.    The charges for the PfNCS tests were fraudulent in that the PfNCS tests were medically unnecessary and performed, not to treat or otherwise benefit the Insureds, but instead pursuant to the Defendants' predetermined treatment protocol and improper financial and referral arrangements between the Defendants and others.

160.    The Defendants billed the PfNCS tests to GEICO through the PC Defendants as multiple charges under CPT codes 95999, 95904, 95910, or 95911 generally resulting in multiple charges of more than $1,000.00 for each Insured on whom the PfNCS testing purportedly was performed.

### (i)    Legitimate Tools for Radiculopathy Diagnosis

161.    Zilberman and the PC Defendants supposedly provided the PfNCS test to Insureds in order to diagnose radiculopathies, which are a type of neuropathy.

162.    There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities (i.e., neuropathies) in the peripheral nerves and in the nerve roots (i.e., radiculopathies).  These diagnostic tests are NCV tests, EMG tests, and magnetic resonance imaging tests ("MRIs").

163.    MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body.  MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through the images of the nerves, nerve roots, and surrounding areas.

### (ii) The Medically Useless PfNCS Tests

164.    The PfNCS "test" is a type of sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots.  It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

165.    The PfNCS tests are performed by administering an electrical stimulus at specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face.  The voltage is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage.  "Findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

166.    If the patient's sensation threshold is greater than the purported normal range of voltage required to evoke a sensation, it allegedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function).  If the voltage required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

167.    In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in PfNCS testing.

168.    Specifically, there is no reliable evidence of the existence of normal ranges of intensity or voltage required to evoke a sensation using a PfNCS test device.  Given the lack of evidence of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal PfNCS test results are normal or abnormal.

169.    Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a PfNCS test device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicate a hypoesthetic condition or that a sensation threshold less than the normal range would indicate a hyperesthetic condition.

170.    Similarly, even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from PfNCS tests.   Indeed, numerous pathological and physiological conditions other than peripheral nerve damage can cause hyperesthesia and hypoesthesia.

171.    Furthermore, even if PfNCS tests could produce any valid diagnostic information regarding the sensory nerve fibers:

> (i)    no reliable evidence proves that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

> (ii)    no reliable evidence proves that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

> (iii)    no reliable evidence proves that any such information would indicate the specific location of the abnormality along the sensory nerve pathways; and

> (iv)    PfNCS tests do not provide any information regarding the motor nerves or motor nerve roots, which are as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident.

172.    Simply put, no legitimate medical evidence supports the conclusion that PfNCS tests are in any way useful, let alone medically necessary, to diagnose neuropathies in general or radiculopathies in particular.

173.    Notably, the Centers for Medicare & Medicaid Services ("CMS") have determined that PfNCS tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and radiculopathies, and therefore are not compensable.

174.    In keeping with the fact that Zilberman and the PC Defendants' putative PfNCS tests were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for PfNCS tests.

175.    In keeping with the fact that Zilberman and the PC Defendants' purported PfNCS tests were medically useless, the putative "results" of the PfNCS tests were not incorporated into any Insured's treatment plan, and the PfNCS tests played no genuine role in the treatment or care of the Insureds.

(iii)    <b>Each of the Two Main PfNCS Test Device Manufacturers Claims the Other is a Fraud</b>

176.    Until 2004, about the same time that CMS was considering the medical benefits of PfNCS testing before ultimately issuing its National Coverage Determination that denied Medicare coverage of PfNCS tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

177.    Neurotron, Inc. manufactured a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold.

38

178.     In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II".

179.     Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

180.     Neuro Diagnostic Associates, Inc. claims that the Neurometer does not produce valid data or results, and has been fraudulently marketed.  For its part, Neurotron Inc. has asserted the same claims regarding Neuro Diagnostic Associates, Inc.'s Medi-Dx 7000/Axon-II.

181.     Upon information and belief, the Defendants utilized either a Neurometer or Axon-II to perform PfNCS testing on Insureds.

### 4.     The Fraudulent Charges for Spinal Ultrasound/Sonogram

182.     As set forth in Exhibit "4", Dos Manos and Zilberman also purported to subject many Insureds to medically unnecessary and useless spinal ultrasound tests.

183.     The charges for the spinal ultrasound tests were fraudulent in that the spinal ultrasound tests were medically unnecessary and were performed pursuant to the kickbacks that Zilberman and the PC Defendants paid at the Clinics in coordination with Kruglyak and others, not to treat or otherwise benefit the Insureds.

184.     For these services, Dos Manos bills for what it labels as "musculoskeletal sonography exam" and interpretations and typically bills GEICO $1,350.00 under CPT code 76999 for this service.

185.     To the extent any such testing is actually performed, Dos Manos is only providing spinal ultrasound testing.

186.     An ultrasound is a noninvasive imaging technique that relies on detection of the reflections or echoes generated as high-frequency sound waves are passed into the body. Physicians commonly use this technique for a number of imaging purposes such as investigation of abdominal and pelvic masses, cardiac echocardiography, and prenatal fetal imaging.

187.     There is no support for the use of spinal ultrasound tests in the evaluation of patients with back pain or radicular symptoms.  The procedure is worthless and of no clinical value in the manner used by Defendants to purportedly diagnose and treat Insureds presenting with back pain or radicular symptoms, allegedly caused by automobile accidents.

188.     The American Institute of Ultrasound Medicine ("AIUM"), which consists of thousands of healthcare professionals and is dedicated to advancing the safe and effective use of ultrasound medicine, determined that "the use of non-operative spinal/paraspinal ultrasound in adults…for diagnostic evaluation, including pain or radiculopathy syndromes, and for monitoring of therapy has no proven clinical utility.  See Exhibit "6".

189.     The American Academy of Neurology ("AAN") issued a report that evaluated the use of spinal ultrasound for diagnosing back pain and radicular disorders.  The report concluded that there is no support for the use of diagnostic ultrasound in the evaluation of patients with back pain or radicular symptoms.  The procedure cannot be recommended for use in the clinical evaluation of such patients.  See Exhibit "7".

190.     Consistent with the above-referenced authorities, the New York State Workers Compensation Board, Mid & Low Back Injury Medical Treatment Guidelines also state that "Diagnostic ultrasound is not recommended for patients with back pain."  See Exhibit "8"

191.     Despite the lack of medical value or utility in the context of No-Fault automobile accident victims suffering spinal/paraspinal injuries, Zilberman and Dos Manos have submitted,

or caused to be submitted, thousands of dollars in bills for spinal and paraspinal ultrasound tests to GEICO, as part of the Fraudulent Services.

192.    To conceal the lack of medical utility of the spinal ultrasound testing, Zilberman and Dos Manos falsely label the testing they purport to perform as "musculoskeletal sonography".

193.    Notwithstanding Zilberman and Dos Manos' false description of the services purportedly performed, Zilberman and Dos Manos knowingly only perform spinal ultrasound tests that are medically unnecessary, if not completely useless for the purposes billed to GEICO.

**5.    The Fraudulent Charges for Chiropractic Treatments**

194.    As set forth in Exhibits "1", "2", and "3", based upon the fraudulent pre-determined "diagnoses" provided during the initial chiropractic examinations, and the phony, pre-determined results of the electrodiagnostic tests, the Defendants purported to subject Insureds to many months of medically unnecessary in-office chiropractic treatments, and billed GEICO for these treatments through Yan Z, Maz, and Sanford (collectively the "Chiropractic Defendants").

195.    Like all of the Defendants' other charges for the Fraudulent Services, the charges for the chiropractic treatments were fraudulent in that the services were medically unnecessary and were performed pursuant to the kickbacks that Zilberman and the PC Defendants paid at the Clinics in coordination with Kruglyak and others, not to treat or otherwise benefit the Insureds.

196.    Virtually none of the Insureds whom the Chiropractic Defendants purported to treat suffered from any significant injuries or continuing health problems as a result of the relatively minor accidents they experienced or purported to experience.

197.    In keeping with the fact that the Insureds in the claims identified in Exhibits "1", "2", and "3" were not seriously injured in their minor automobile accidents, and suffered from no significant injuries or continuing health problems as the result of their accidents, they virtually

always either did not visit any hospital at all following their accidents, or else were observed on an outpatient basis for a few hours at a hospital and released with an ordinary sprain or strain diagnosis.

198.    Ordinary strains and sprains virtually always resolve after a brief course of conservative treatment, or no treatment at all.

199.    Even so, and as set forth in Exhibits "1", "2", and "3", the Chiropractic Defendants routinely purported to provide the Insureds with dozens of individual chiropractic treatments, spanning several months, despite the fact that the Insureds did not require them.

**D.    The Fraudulent Billing for Independent Contractor Services**

200.    The Defendants' fraudulent scheme also included submission of claims to GEICO on behalf of the PC Defendants seeking payment for services provided by independent contractors.

201.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

202.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI

Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS.  See Exhibit "9".

203.   Zilberman and Defendants routinely submitted charges to GEICO and other insurers for Fraudulent Services that purportedly were performed by chiropractors other than Zilberman.

204.   The chiropractors working under the names of the PC Defendants set their own work schedules or had their schedules set for them by Kruglyak and other unlicensed laypersons.

205.   The chiropractors working under the names of the PC Defendants worked without any supervision by Zilberman.

206.   The chiropractors working under the names of the PC Defendants did not exclusively provide services for the PC Defendants.

207.   To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare services providers other than Zilberman were performed by chiropractors whom Zilberman and the PC Defendants treated as independent contractors.

208.   For instance, Zilberman and the PC Defendants:

     (i)     paid the chiropractors, either in whole or in part, on a 1099 basis rather than a W-2 basis;

     (ii)    established an understanding with the chiropractors that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the chiropractors;

(iv)    failed to secure and maintain W-4 or I-9 forms for the chiropractors;

(v)    failed to withhold federal, state, or city taxes on behalf of the chiropractors;

(vi)    compelled the chiropractors to pay for their own malpractice insurance at their own expense;

(vii)    permitted the chiropractors to set their own schedules and days on which they desired to perform services;

(viii)    permitted the chiropractors to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices;

(ix)    failed to cover the chiropractors for either unemployment or workers' compensation benefits; and

(x)    filed corporate and payroll tax returns (e.g., Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the chiropractors and unlicensed technicians were independent contractors.

209.    By electing to treat the chiropractors as independent contractors, Zilberman and the PC Defendants realized significant economic benefits – for instance:

(i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)    avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the chiropractors.

210.    Because the chiropractors were independent contractors and performed the Fraudulent Services, Zilberman and the PC Defendants never had any right to bill or collect PIP Benefits in connection with those services.

211.    Zilberman and the PC Defendants billed for the Fraudulent Services as if they were provided by actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement.

212.    The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**E.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

213.    To support their fraudulent charges, Zilberman and the PC Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which Zilberman and the PC Defendants were not entitled to receive payment.

214.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the PC Defendants were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the PC Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the PC Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the PC Defendants uniformly fraudulently concealed the

fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iv)   With the exception of NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by Zilberman, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of, the PC Defendants uniformly misrepresented to GEICO that Zilberman and the PC Defendants were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed.  In fact, Zilberman and the PC Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent they were provided at all.

## III.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

215.   Zilberman and the PC Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

216.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

217.   Specifically, the Defendants knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

218.   Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

219.   Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-

determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

220.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the chiropractors associated with the PC Defendants in order to prevent GEICO from discovering that the chiropractors performing many of the Fraudulent Services were not employed by the PC Defendants.

221.    What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

222.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

223.    In accordance with the New York no-fault insurance laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for PIP Benefits submitted through the PC Defendants; (ii) timely issued requests for additional verification with respect to the pending claims for PIP Benefits submitted through the PC Defendants; (iii) timely issued payment with respect to the claims submitted through the PC Defendants; or else (iv) the time in which to pay or deny the pending claims for PIP Benefits submitted through the PC Defendants, or to request additional verification of those claims, has not expired.

224.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers.   These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

225.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.   The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them.   As a result, GEICO incurred damages of more than $1,200,000.00 based upon the fraudulent charges.

226.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against Zilberman and the PC Defendants**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

227.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

228.    There is an actual case and controversy between GEICO and the PC Defendants regarding more than $3,400,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to GEICO through the PC Defendants.

229.    Zilberman and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

230.    Zilberman and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

231.    Zilberman and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

232.    Zilberman and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants.

233.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Zilberman and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against Zilberman**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

234.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

235.    Yan Z is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

236.    Zilberman knowingly has conducted and/or participated, directly or indirectly, in the conduct of Yan Z's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Yan Z was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Yan Z obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Yan Z's employees.    The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

237.    Yan Z's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.    The predicate acts of mail fraud are the regular way in which Zilberman operates Yan Z, insofar as Yan Z is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Yan Z to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Yan Z to the present day.

238.    Yan Z is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.   These inherently unlawful acts are taken by Yan Z in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

239.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $426,000.00 pursuant to the fraudulent bills submitted through Yan Z.

240.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Zilberman and Kruglyak**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

241.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

242.    Yan Z is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

243.    Zilberman and Kruglyak are employed by or associated with the Yan Z enterprise.

244.    Zilberman and Kruglyak knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Yan Z's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Yan Z was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services

were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Yan Z obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Yan Z's employees.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

245.    Zilberman and Kruglyak knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

246.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $426,000.00 pursuant to the fraudulent bills submitted through Yan Z.

247.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Against Zilberman and Yan Z**
**(Common Law Fraud)**

248.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

249.     Zilberman and Yan Z intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

250.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Yan Z was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Yan Z and Zilberman; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Yan Z, when in fact many of the billed-for services were provided by independent contractors.

251.     Zilberman and Yan Z intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Yan Z that were not compensable under the New York no-fault insurance laws.

252.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $426,000.00 pursuant to the fraudulent bills submitted through Yan Z.

253.    Zilberman and Yan Z's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

254.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against Zilberman and Yan Z**
**(Unjust Enrichment)**

255.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

256.    As set forth above, Zilberman and Yan Z have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

257.    When GEICO paid the bills and charges submitted by or on behalf of Yan Z for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Yan Z and Zilberman's improper, unlawful, and/or unjust acts.

258.    Zilberman and Yan Z have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Zilberman and Yan Z voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

259.    Zilberman and Yan Z's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

260.    By reason of the above, Zilberman and Yan Z have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $426,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against Kruglyak
### (Aiding and Abetting Fraud)

261.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

262.    Kruglyak knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Zilberman and Yan Z.

263.    The acts of Kruglyak in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of a transient chiropractic practice designed to defraud No-fault insurers, accepting kickbacks from Zilberman and Yan Z in exchange for having Insureds referred to Yan Z, and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

264.    The conduct of Kruglyak in furtherance of the fraudulent scheme was significant and material.  The conduct of Kruglyak was a necessary part of and was critical to the success of the fraudulent scheme because, without his actions, there would have been no opportunity for Zilberman or Yan Z to obtain payment from GEICO and other insurers.

265.    Kruglyak aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Zilberman and Yan Z for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because he sought to continue profiting through the fraudulent scheme.

266.    The conduct of Kruglyak caused GEICO to pay more than $426,000.00 pursuant to the fraudulent bills submitted through Yan Z.

267.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

268.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**Against Zilberman**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

269.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

270.     Maz is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

271.     Zilberman knowingly has conducted and/or participated, directly or indirectly, in the conduct of Maz's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Maz was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Maz obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Maz's employees.   The fraudulent billings and corresponding mailings submitted to GEICO that

comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

272.    Maz's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Zilberman operates Maz, insofar as Maz is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Maz to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Maz to the present day.

273.    Maz is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Maz in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

274.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $327,000.00 pursuant to the fraudulent bills submitted through Maz.

275.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Zilberman and Kruglyak
### (Violation of RICO, 18 U.S.C. § 1962(d))

276.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

277.    Maz is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

278.    Zilberman and Kruglyak are employed by or associated with the Maz enterprise.

279.    Zilberman and Kruglyak knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Maz's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Maz was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Maz obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Maz's employees.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

280.    Zilberman and Kruglyak knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

281.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $327,000.00 pursuant to the fraudulent bills submitted through Maz.

282.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Against Zilberman and Maz**
**(Common Law Fraud)**

283.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

284.     Zilberman and Maz intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

285.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Maz was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Maz and Zilberman; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the

representation that the billed-for services were provided by employees of Maz, when in fact many of the billed-for services were provided by independent contractors.

286.    Zilberman and Maz intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Maz that were not compensable under the New York no-fault insurance laws.

287.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $327,000.00 pursuant to the fraudulent bills submitted through Maz.

288.    Zilberman and Maz's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

289.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION
### Against Zilberman and Maz
### (Unjust Enrichment)

290.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

291.    As set forth above, Zilberman and Maz have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

292.    When GEICO paid the bills and charges submitted by or on behalf of Maz for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Maz and Zilberman's improper, unlawful, and/or unjust acts.

293.    Zilberman and Maz have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Zilberman and Maz voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

294.    Zilberman and Maz's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

295.    By reason of the above, Zilberman and Maz have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $327,000.00.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Against Kruglyak
### (Aiding and Abetting Fraud)

296.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

297.    Kruglyak knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Zilberman and Maz.

298.    The acts of Kruglyak in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of a transient chiropractic practice designed to defraud No-fault insurers, accepting kickbacks from Zilberman and Maz in exchange for having Insureds referred to Maz and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

299.    The conduct of Kruglyak in furtherance of the fraudulent scheme was significant and material.  The conduct of Kruglyak was a necessary part of and was critical to the success of the fraudulent scheme because, without his actions, there would have been no opportunity for Zilberman or Maz to obtain payment from GEICO and other insurers.

300.    Kruglyak aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Zilberman and Maz for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because he sought to continue profiting through the fraudulent scheme.

301.    The conduct of Kruglyak caused GEICO to pay more than $327,000.00 pursuant to the fraudulent bills submitted through Maz.

302.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

303.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWELFTH CAUSE OF ACTION
### Against Zilberman
### (Violation of RICO, 18 U.S.C. § 1962(c))

304.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

305.    Sanford is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

306.    Zilberman knowingly has conducted and/or participated, directly or indirectly, in the conduct of Sanford's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Sanford was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the

billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Sanford obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Sanford's employees. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

307.   Sanford's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zilberman operates Sanford, insofar as Sanford is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Sanford to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Sanford to the present day.

308.   Sanford is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Sanford in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

309.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $257,000.00 pursuant to the fraudulent bills submitted through Sanford.

310.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRTEENTH CAUSE OF ACTION**
**Against Zilberman and Kruglyak**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

311.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

312.     Sanford is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

313.     Zilberman and Kruglyak are employed by or associated with the Sanford enterprise.

314.     Zilberman and Kruglyak knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Sanford's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Sanford was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Sanford obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Sanford's employees.  The fraudulent bills and corresponding mailings

submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

315.    Zilberman and Kruglyak knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

316.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $257,000.00 pursuant to the fraudulent bills submitted through Sanford.

317.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
**Against Zilberman and Sanford**
**(Common Law Fraud)**

318.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

319.    Zilberman and Sanford intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

320.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Sanford was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and

were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Sanford and Zilberman; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Sanford, when in fact many of the billed-for services were provided by independent contractors.

321.   Zilberman and Sanford intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Sanford that were not compensable under the New York no-fault insurance laws.

322.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $257,000.00 pursuant to the fraudulent bills submitted through Sanford.

323.   Zilberman and Sanford's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

324.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**AS AND FOR A FIFTEENTH CAUSE OF ACTION**
**Against Zilberman and Sanford**
**(Unjust Enrichment)**

325.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

326.     As set forth above, Zilberman and Sanford have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

327.     When GEICO paid the bills and charges submitted by or on behalf of Sanford for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Sanford and Zilberman's improper, unlawful, and/or unjust acts.

328.     Zilberman and Sanford have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Zilberman and Sanford voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

329.     Zilberman and Sanford's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

330.     By reason of the above, Zilberman and Sanford have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $257,000.00.

### AS AND FOR A SIXTEENTH CAUSE OF ACTION
**Against Kruglyak**
**(Aiding and Abetting Fraud)**

331.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

332.     Kruglyak knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Zilberman and Sanford.

333.     The acts of Kruglyak in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of a transient chiropractic practice designed to defraud No-fault insurers, accepting kickbacks from Zilberman and Sanford in exchange for having Insureds referred to Sanford, and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

334.    The conduct of Kruglyak in furtherance of the fraudulent scheme was significant and material.  The conduct of Kruglyak was a necessary part of and was critical to the success of the fraudulent scheme because, without his actions, there would have been no opportunity for Zilberman or Sanford to obtain payment from GEICO and other insurers.

335.    Kruglyak aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Zilberman and Sanford for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because he sought to continue profiting through the fraudulent scheme.

336.    The conduct of Kruglyak caused GEICO to pay more than $257,000.00 pursuant to the fraudulent bills submitted through Sanford.

337.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

338.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
**Against Zilberman**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

339.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

340.    Dos Manos is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

341.    Zilberman knowingly has conducted and/or participated, directly or indirectly, in the conduct of Dos Manos' affairs through a pattern of racketeering activity consisting of repeated

violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Dos Manos was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Dos Manos obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Dos Manos' employees.   The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

342.   Dos Manos' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.   The predicate acts of mail fraud are the regular way in which Zilberman operates Dos Manos, insofar as Dos Manos is not engaged in a legitimate chiropractic practice, and therefore, acts of mail fraud are essential in order for Dos Manos to function.   Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Dos Manos to the present day.

343.   Dos Manos is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.   These

inherently unlawful acts are taken by Dos Manos in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

344.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $230,000.00 pursuant to the fraudulent bills submitted through Dos Manos.

345.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR AN EIGHTEENTH CAUSE OF ACTION**
**Against Zilberman and Kruglyak**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

346.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

347.     Dos Manos is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

348.     Zilberman and Kruglyak are employed by or associated with the Dos Manos enterprise.

349.     Zilberman and Kruglyak knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Dos Manos' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Dos Manos was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing

codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Dos Manos obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Dos Manos' employees.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

350.    Zilberman and Kruglyak knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

351.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $230,000.00 pursuant to the fraudulent bills submitted through Dos Manos.

352.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A NINETEENTH CAUSE OF ACTION**
**Against Zilberman and Dos Manos**
**(Common Law Fraud)**

353.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

354.    Zilberman and Dos Manos intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

355.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Dos Manos was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Dos Manos and Zilberman; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Dos Manos, when in fact many of the billed-for services were provided by independent contractors.

356.    Zilberman and Dos Manos intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Dos Manos that were not compensable under the New York no-fault insurance laws.

357.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $230,000.00 pursuant to the fraudulent bills submitted through Dos Manos.

358.    Zilberman and Dos Manos' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

359.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTIETH CAUSE OF ACTION
**Against Zilberman and Dos Manos**
**(Unjust Enrichment)**

360.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

361.    As set forth above, Zilberman and Dos Manos have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

362.    When GEICO paid the bills and charges submitted by or on behalf of Dos Manos for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Dos Manos and Zilberman's improper, unlawful, and/or unjust acts.

363.    Zilberman and Dos Manos have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Zilberman and Dos Manos voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

364.    Zilberman and Dos Manos' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

365.    By reason of the above, Zilberman and Dos Manos have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $230,000.00.

### AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
**Against Kruglyak**
**(Aiding and Abetting Fraud)**

366.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

367.    Kruglyak knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Zilberman and Dos Manos.

368.    The acts of Kruglyak in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of a transient chiropractic practice designed to defraud No-fault insurers, accepting kickbacks from Zilberman and Dos Manos in exchange for having Insureds referred to Dos Manos and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

369.    The conduct of Kruglyak in furtherance of the fraudulent scheme was significant and material.  The conduct of Kruglyak was a necessary part of and was critical to the success of the fraudulent scheme because, without his actions, there would have been no opportunity for Zilberman or Dos Manos to obtain payment from GEICO and other insurers.

370.    Kruglyak aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Zilberman and Dos Manos for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because he sought to continue profiting through the fraudulent scheme.

371.    The conduct of Kruglyak caused GEICO to pay more than $230,000.00 pursuant to the fraudulent bills submitted through Dos Manos.

372.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

373.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

374.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a judgment be entered in their favor:

A.    On the First Cause of Action against Zilberman and the PC Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Zilberman and the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Zilberman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $426,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Zilberman and Kruglyak, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $426,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Zilberman and Yan Z, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $426,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.    On the Fifth Cause of Action against Zilberman and Yan Z, more than $426,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Kruglyak, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $426,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Zilberman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $327,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Zilberman and Kruglyak, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $327,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Zilberman and Maz, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $327,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Zilberman and Maz, more than $327,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Kruglyak, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $327,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Zilberman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $257,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Zilberman and Kruglyak, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $257,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Zilberman and Sanford, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $257,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Zilberman and Sanford, more than $257,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Kruglyak, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $257,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Zilberman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $230,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Zilberman and Kruglyak, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $230,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Zilberman and Dos Manos, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $230,000.00,

together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

      T.     On the Twentieth Cause of Action against Zilberman and Dos Manos, more than $230,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper; and

      U.     On the Twenty-First Cause of Action against Kruglyak, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $230,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated:  August 4, 2021
        Uniondale, New York

                    RIVKIN RADLER LLP

                    By:   */s/ Michael A. Sirignano*_____
                         Barry I. Levy (BL 2190)
                         Michael A. Sirignano (MS 5263)
                         Sean Gorton (SG 9310)
                  926 RXR Plaza
                  Uniondale, New York 11556
                  (516) 357-3000
                  RR File:  5100-2923
                  *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*